UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————

PEGGY L. DOORNBOS,

      Plaintiff,                             Case No.  1:16-CV-641

v.

                                         HON. ROBERT J. JONKER

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant,

———————————————————/

## OPINION

      This is a social security action brought under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

### STANDARD OF REVIEW

      The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  It is the Commissioner who is charged with finding the

facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance.  *See Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted).  It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).  In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever evidence in the record fairly detracts from its weight.  *See Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984).  The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff's application for benefits was previously considered by Magistrate Judge Hugh Brenneman, Jr.  In a decision dated September 29, 2014, Judge Brenneman summarized the procedural history of this case to that point as follows:

> Plaintiff was born on October 26, 1967.  She alleged a disability onset date of July 21, 2005, when she slipped and fell on her coccyx [tail bone] while at work.  Plaintiff stated that she earned an associate's degree in stenography, obtained a real estate license, and "went to school to learn how to do nails."  She had past work as a general

2

> laborer, a manager of a fast food restaurant, a manager of a restaurant, a medical transcriptionist, a court stenographer, and a pin polisher for a jewelry manufacturer. Plaintiff identified her disabling condition as coccydynia.
>
> Plaintiff's claim was originally denied in a decision by Administrative Law Judge (ALJ) William G. Reamon dated October 28, 2010. ALJ Reamon's decision was remanded by the Appeals Council for further evaluation of the evidence. On remand, ALJ Donna J. Grit reviewed plaintiff's claim *de novo* and entered a written decision denying benefits on July 10, 2012. This decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

*Doornbos v. Comm'r of Soc. Sec.*, No. 1:13-cv-595 ECF No. 18, PageID.1429–1430 (internal citations and footnotes omitted). Judge Brenneman proceeded to conclude that the Commissioner's decision was not supported by substantial evidence, remanded the case, and directed the Commissioner to: "(1) re-evaluate plaintiff's credibility with respect to the ALJ's finding that the objective diagnostic findings did not substantiate the degree of pain alleged by plaintiff; (2) re-evaluate Dr. Lippert's opinion with respect to the squatting restriction; and (3) re-evaluate Dr. Lemke's opinions expressed in his December 14, 2009 RFC questionnaire." *Doornbos v. Comm'r of Soc. Sec.*, No. 1:13-cv-595 ECF No. 18, PageID.1447.

On December 22, 2014, consistent with Judge Brenneman's order, the Appeals Council vacated the prior decision and remanded the case to ALJ Grit for further action. (PageID.1555–1558.) On March 17, 2015, ALJ Grit held another administrative hearing, at which time both Plaintiff and a vocational expert (VE) testified. (PageID.1335–1391.) Thereafter, in a written decision dated May 29, 2015, ALJ Grit determined Plaintiff was not disabled. (PageID.1286–1334.) On April 13, 2016, the Appeals Council declined to the review the ALJ's

decision, making it the Commissioner's final decision in the matter.  (PageID.1280–1282.)  Plaintiff subsequently initiated this action under 42 U.S.C. § 405(g).

Plaintiff's insured status expired on December 31, 2010.  (PageID.1291.) Accordingly, to be eligible for DIB under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status.  *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. § 404.1520(a-f).[1]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. § 404.1520(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining the claimant's residual functional capacity (RFC). *See* 20 C.F.R. § 404.1545.

---

[1] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. § 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. § 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. § 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. § 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed. (20 C.F.R. § 404.1520(f)).

4

Plaintiff has the burden of proving the existence and severity of limitations caused by her impairments and that she is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

In the decision for review by this Court, ALJ Grit determined Plaintiff's claim failed at step five. At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 21, 2005, the alleged disability onset date. (PageID.1291.) At step two, the ALJ found that Plaintiff suffered from the severe impairments of: (1) coccydynia and pelvic floor myalgia, dysfunction, and pain; (2) rectocele; (3) sigmoidocele; (4) iron deficiency anemia; (5) attention deficit hyperactivity disorder; (6) affective disorder; (7) anxiety disorder; (8) and history of drug and alcohol abuse. (PageID.1291–1293.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments found in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (PageID.1293–1295.) At step four, the ALJ determined Plaintiff retained the RFC based on all the impairments, through her date last insured, to perform:

> light work as defined in 20 CFR 404.1567(b) limited to lifting and carrying ten pounds frequently and up to twenty pounds occasionally. The claimant could stand and walk for up to two hours, and sit for up to six hours in an eight-hour workday. However, the claimant required a sit-stand option that allowed her to change positions from sit to stand and stand to sit at least every thirty minutes. The claimant could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but she could not climb ladders, ropes, or scaffolds. The claimant could also have only occasional exposure to extreme cold, and no exposure to vibration. Additionally, the claimant could understand, remember, and perform simple tasks and make simple

> work–related decisions.  The claimant could also only adjust to
> occasional changes in her work environment or work expectations.
> However, the claimant retained the ability to work independently and
> to interact with supervisors, coworkers, and the public.

(PageID.1295–1296.)  Continuing with the fourth step, the ALJ determined that Plaintiff was

incapable of performing her past relevant work.  (PageID.1321–1322.)  At the fifth step, the ALJ

questioned the VE to determine whether a significant number of jobs exist in the economy that

Plaintiff could perform given her limitations.  *See Richardson*, 735 F.2d at 964.  The expert testified

that Plaintiff could perform other work as a light assembler (250,000 national jobs), packager

(122,000 national jobs), and machine tender (101,000 national jobs).  (PageID.1386–1387.)  Based

on this record, the ALJ found that Plaintiff was capable of making a successful adjustment to work

that exists in significant numbers in the national economy. (PageID.1323.)

Accordingly, the ALJ again concluded that Plaintiff was not disabled from July 21,

2005,  through December 31, 2010, the date last insured.  (PageID.1323.)

## DISCUSSION

**1.      The ALJ's Decision is Not Internally Inconsistent.**

Plaintiff first argues that the specific limitations articulated by the ALJ in her RFC

assessment do not adequately take account of, or properly correlate with, her limitations with respect

to concentration, persistence, and pace.  (PageID.2086–2088.)  Plaintiff, however, fails to recognize

that the ALJ's assessment of disorders at steps two and three:

> are not an RFC assessment but are used to rate the severity of mental
> impairment(s) at steps 2 and 3 of the sequential evaluation process.
> The mental RFC assessment used at steps 4 and 5 of the sequential
> evaluation process requires a more detailed assessment by itemizing
> various functions contained in the broad categories found in

6

paragraphs B and C of the adult mental disorders listings in 12.00 of
the Listing of Impairments.

SSR 96–8p, 1996 WL 374184, at *4 (July 2, 1996); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1,

§ 12.00.A. ("RFC is a multidimensional description of the work-related abilities you retain in spite

of your medical impairments. An assessment of your RFC complements the functional evaluation

necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of

work-related capacities that may be affected by mental disorders when your impairment(s) is severe

but neither meets nor is equivalent in severity to a listed mental disorder").

The court discussed a similar issue in *Pinkard v. Commissioner of Social Security*

*Administration*, No. 1:13–cv–1339, 2014 WL 3389206 (N.D. Ohio July 9, 2014).   That case

explained the difference between the findings made at step three to determine whether a claimant

met the requirements of a particular listed impairment and the RFC determination made at step four

as follows:

> Next, Plaintiff argues that the ALJ erred in concluding that Plaintiff
> had moderate difficulties in concentration, persistence, and pace,
> while failing to include an appropriate limitation for these difficulties
> in the RFC findings . . . Plaintiff refers to the ALJ's paragraph B
> findings in his evaluation of Plaintiff's depression under 12.04 of the
> listing of impairments [ ]. 20 C.F.R. pt. 404, subpt. P, app. 1 Sections
> 12.04, 12.05, 12.06. However, the ALJ does not have to include
> paragraph B finding[s] in his RFC finding. Paragraph B findings
> under the listings are findings at step three of the sequential
> evaluation process, and are not RFC findings pertaining to steps four
> and five of the sequential evaluation process. 20 C.F.R. pt. 404,
> subpt. P, app. 1, Section 12.00.   Hence, the ALJ was correct in
> finding that Plaintiff had moderate limitations in evaluating her
> mental impairment under the listings at step three of the sequential
> evaluation process, and in not including a "moderate limitation in
> concentration, persistence, and pace" in his residual functional
> capacity finding at steps four and five.

7

*Pinkard*, 2014 WL 3389206 at *10.  Accordingly, "[c]ourts have repeatedly found that in the absence of medical evidence supporting specific limitations . . . an RFC's limitation to simple repetitive tasks may very well be adequate to address a claimant's moderate impairment as to concentration, persistence, and pace." *Kardos v. Comm'r of Soc. Sec.*, 2013 WL 1869110 at *1 (W.D. Mich., May 3, 2013).  The record in this case does not contain specific limitations as to concentration, persistence, and pace.  *Cf. Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) (remanding when the ALJ had adopted a specific limitation for "simple repetitive tasks" in "[two-hour] segments over an eight-hour day where speed was not critical.")  Thus, the question becomes whether the evidence substantially supports the ALJ's conclusion that the aforementioned limitations sufficiently account for Plaintiff's non-exertional limitations, including those regarding concentration, persistence, and pace.  The Court finds that there is.

Indeed, Plaintiff does not point to any records establishing greater limitations in concentration, persistence, and pace, than those accounted for in the RFC.  Treatment records do indicate that Plaintiff experienced difficulties with substance abuse, and had received treatment for depression and anxiety, but was not otherwise experiencing symptoms inconsistent with the ALJ's assessment.  Plaintiff's depression, for example, was described at times as "stable."  (PageID.734.) She was also described as alert, oriented, focused, and coherent.  (PageID.730–732.)  Further, she reported improvement after taking medication.  (PageID.610, 730–731.)  Though Plaintiff reported experiencing continued difficulties, no medical provider offered specific limitations to account for these impairments.  At an October 2008, psychological evaluation with Dr. Timothy Zwart, Ed.D, Plaintiff was diagnosed with ADHD, and began taking medication for that disorder as well as attending counseling sessions.  (PageID.793–797.)  Plaintiff appears to have experienced a dramatic

improvement with this treatment.  She reported feeling "much more pulled together" and at several

appointments she reported that her concentration and organization had improved.  (PageID.803, 844,

878.)  Though the record also shows Plaintiff at times reported confusion and would isolate herself,

again, the record contains no specific limitations to account for these impairments.  In sum, the ALJ

adequately accounted for Plaintiff's non-exertional impairments when determining Plaintiff's RFC.

The Court finds no inconsistency here.

### 2.       The ALJ's Evaluation of Plaintiff's Credibility.

At the administrative hearing, Plaintiff testified that she was impaired to an extent

far greater than that recognized by the ALJ.  She reported abdominal cramps, spasms, and a dull

aching pain radiating down her legs.  (PageID.1360–1361.)  She further reported she could only sit

comfortably for thirty minutes, but would still feel spasms even for that period.  (PageID.1361.)  She

could not sleep more than two hours at a time.  (PageID.1362.)  During the day she would only do

small things throughout the house and watch TV, and would otherwise isolate herself.

(PageID.1370.)  She had twice tried to commit suicide in the past two months.  (PageID.1380.)  She

further testified she could not work a full time job, even a sedentary one with a sit-stand option,

because she would not be able to be reliably on task.  (PageID.1373.)  The ALJ found Plaintiff's

complaints were "not entirely credible."  (PageID.1309.)  In her second claim of error, Plaintiff

contends the ALJ erred in discounting her complaints.  (PageID.2041–2051.)

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical

impairment, may be severe enough to constitute disability."  *King v. Heckler*, 742 F.2d 968, 974 (6th

Cir. 1984); *see also Grecol v. Halter*, 46 F. App'x 773, 775 (6th Cir. 2002).  As the relevant Social

Security regulations make clear, however, a claimant's "statements about [her] pain or other

symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Instead, a claimant's assertions of disabling pain and limitation are evaluated under the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004).

Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully

10

credible, a finding that should not be lightly disregarded.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987).  In fact, as the Sixth Circuit has stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable."  *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted).[2]

Plaintiff begins by claiming the ALJ erred by including a summary of the evidence in this case as well as including the following boilerplate paragraph regarding her credibility:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(PageID.2041–2043.)  The thrust of Plaintiff's claim on this point is that this language is too vague to discount her credibility.  If all the ALJ had done was to provide a summation of the evidence from this case and then discount Plaintiff's allegations using the above paragraph, Plaintiff may well have a valid claim.  *See Gonzalez v. Comm'r of Soc. Sec.*, No. 1:06-CV-687, 2008 WL 584927, at *6 (W.D. Mich. Jan. 17, 2008).  Indeed as the Sixth Circuit has recognized, the "chief concern with the popularity [of boilerplate language] is the risk that an ALJ will mistakenly believe it sufficient to *explain* a credibility finding, as opposed to merely introducing or summarizing one." *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 260 (6th Cir. 2015) (emphasis in original).  But that is not the case here. To the contrary, after providing a thorough and accurate recitation of the record, the ALJ

---

[2] Plaintiff's brief argues the standard of review here should be much less deferential and claims that the ALJ was required to adopt all those statements that were not directly contradicted. (PageID.2043–2045.)  As other courts in this district have held, however, Plaintiff's argument is contrary to the controlling authority identified above and "stretches the language of this regulation too far." *Pratt v. Comm'r of Soc. Sec.*, No. 1:10-CV-438, 2012 WL 5844969, at *6 (W.D. Mich. Nov. 19, 2012).  Indeed, the regulation's wording "suggest[s] a subtle and complex weighing process, rather than . . . [a] crude dichotomy." *Id.*  Therefore, the Court declines to adopt Plaintiff's interpretation of the relevant regulations.

provided several concrete reasons for doubting the credibility of Plaintiff's complaints. The Sixth Circuit has found no violation of Social Security policy when the use of boilerplate credibility language is followed by a "thorough explanation elsewhere of [the ALJ's] reasons for doubting [the claimant's] account." *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014). Accordingly, this argument must fail.

Turning to the substance of the ALJ's credibility discussion, as the ALJ recognized the medical evidence does not support Plaintiff's argument that she is limited to an extent greater than that reflected in the RFC. This conclusion is supported by the evidence discussed above. Plaintiff's argument that the ALJ erred by referencing her drug seeking behavior is without merit. The record clearly demonstrates that Plaintiff was taking medication at a frequency and dosage beyond that prescribed from her physicians. Courts have held that drug seeking behavior can form a basis for rejecting a claimant's testimony regarding pain and limitations. *See, e.g.*, *Massey v. Comm'r of Soc. Sec.*, 400 F. App'x 192, 194 (9th Cir. 2010) ("the ALJ's interpretation that [the claimant] is engaged in drug-seeking behavior is a clear and convincing reason for disregarding his testimony"). Similarly, the ALJ did not err in noting Plaintiff's failure to follow prescribed treatment. The ALJ referenced Plaintiff's failure to pursue a defecography study, use a CPAP machine to treat her sleep apnea, and attend several appointments. (PageID.1309.) Plaintiff does not dispute this finding, but attempts to explain her failure to follow treatment by referencing testimony that her medications caused her to be forgetful. (PageID.2094–2095.) Allegations of a medication's side effects must be supported by objective medical evidence. *See Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 665–66 (6th Cir. 2004); *Farhat v. Sec'y of Health & Human Servs.*, No. 91–1925, 1992 WL 174540 at * 3 (6th Cir. July 24, 1992). Plaintiff has not done so here.

The ALJ further observed several inconsistencies found in the record. She noted, for example, Plaintiff's statement that she derived no benefit from a TENS unit, despite continuing to use it for seven years, as well as Plaintiff's statement that she used a walker, despite there being no medical record it was necessary. (PageID.1303, 1645.) On other occasions, Plaintiff reported not using alcohol when taking narcotics, but had admitted drinking when taking narcotics only a few months earlier to a different provider. (PageID.487, 582, 914.) Plaintiff argues that her prior inconsistent statements have no bearing on her present complaints, but provides no authority on point for this proposition. The Court finds the ALJ's conclusion here to be entirely reasonable. Finally, the regulations expressly authorize the ALJ to consider a claimant's daily activities when "[e]valuating the intensity and persistence of . . . symptoms . . . and determining the extent to which . . . symptoms limit [the] capacity for work . . . ." 20 C.F.R. § 404.1529(c)(3). An ALJ may discredit a person's testimony when it contradicts the evidence provided, which may include reports of daily living activities. *Walters*, 127 F.3d at 531–32. Here, Plaintiff reported being able to watching television and read (PageID.357), take care of pets (PageID.358), prepare simple meals (PageID.359), go shopping twice a month for groceries (PageID.360), exercise (PageID.523), travel and go on vacation (PageID.886, 1840), and go boating (PageID.907, 1995). The ALJ reasonably concluded that such activities required greater abilities than Plaintiff claimed she was able to accomplish. In sum, the ALJ's determination to discount Plaintiff's credibility is supported by substantial evidence. Accordingly, this argument is rejected.

### 3.     The ALJ's Analysis of the Medical Opinions.

Plaintiff's final claim of error is that the ALJ erred in assigning less than controlling weight to the opinions from two of her treating physicians. The Court discerns no error.

By way of background, the treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375–76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health & Human Servs.*, 1991 WL 229979, at \*2 (6th Cir. Nov. 7, 1991) (citing *Shavers v. Sec'y of Health & Human Servs.*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where it is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller*, 1991 WL 229979 at \*2 (citing *Shavers*, 839 F.2d at 235 n.1); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286–87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the

14

physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Id.* at 376–77.

> A.      *Dr. J'aimee Anne Lippert.*

At a February 1, 2007, deposition concerning Plaintiff's application for Worker's Compensation Benefits, Dr. J'aimee Lippert testified regarding Plaintiff's treatment. (PageID.637–677.)  Dr. Lippert's testimony began by noting she began treating Plaintiff on October 14, 2005, a few months after Plaintiff had fallen on her tail bone while at work. (PageID.638.)  She diagnosed Plaintiff with pelvic floor pain, coccydynia, lumbago, and somatic dysfunction of the lumbar spine, pelvis, and sacrum.  Dr. Lippert then provided a summary of her treatment with Plaintiff.  She stated that Plaintiff consistently complained of pain at a level of at least seven on a ten point scale.  At times, Plaintiff reported a numbing and tingling sensation in her legs. She also complained of vaginal numbness, and difficulty initiating and controlling urination. (PageID.644-645.)  Plaintiff's counsel then questioned the doctor on Plaintiff's ability to work:

Q.      OK.  I don't see anywhere in your notes where we talked about work restrictions.  You never formally put those in your notes?

A.      No.

Q.      Is there a reason why you didn't do that?

A.      I was never involved to that level.  She never asked me for work restrictions and I was not presented with any paper work to comment on work restrictions.

Q.      OK.  If I were to ask you, based on your treatment of her as of January 19, 2007, the last time you saw her, do you think she can work?

A.      I believe it would be very difficult for Ms. Doornbos to work right now.

Q.      OK.  If we were aiming to get her back to work, what would have to happen?

15

A.   I think that a gradual return to work with specific work restrictions and continued therapy and care through the pain specialist and physical therapist and osteopathic manipulation would be a combined effort to help her return to gainful employment.

Q.   OK. Let's take those each one at a time. First of all, she is on the medication still. Correct?

A.   That is correct.

Q.   Would that have to be addressed before she attempted a return to work?

A.   I think it would be advisable and, as Dr. Schanz, I believe, is the person prescribing all of her pain medication, I'm sure that he would be the person to do that – to look at the appropriate dosages to come to that balance where a patient is functional and able to function but not having untowards side effects such as oversedation, so that she's at a nice balance point with her pain medication.

Q.   And you also talked about this multifactorial approach to returning her to work. Aside from the issues with the pain medication, you mentioned physical therapy and ongoing manipulations and so forth. Why would she need that in concern with pain management in order to even attempt to return to work?

A.   Chronic pain patients in general benefit most from a multifaceted approach that employs different practitioners and specialists to address the different needs that they have. They tend to do better and to have a better network of support and intervention.

Q.   OK. Assuming she did get a good result with this multifaceted approach with the pain doctors and the physical therapy and the manipulations, would she then be able to return to work with some restrictions?

A.   That would certainly be the hope overall.

Q.   Knowing what you know as of January 19, '07, what type of restrictions would be appropriate, assuming she gets the other things that we just talked about?

A.   I would recommend to her, if asked, that she return with the ability to change her position frequently. She has a very difficult time even maintaining one position for a half an hour appointment. So the ability to stand, walk, and

16

even recline if it's appropriate at her determination, as well as limited stair climbing.  Stair climbing tends to be a big issue for her.

No squatting, anything that would cause increased stress and strain on the pelvic floor musculature during her rehabilitation period, and a gradual return, I think, would be warranted so that she is able to self-monitor and gauge on her own how well she is feeling and how functional she is.  So limited hours to start with, frequent breaks, and ability to change position.

Q.    What about lifting limits?

A.    Her ability to lift, because lifting anything of any substantial weight also increases the pressure within the abdomen and pelvis, therefore increasing the pressure on the pelvic floor and coccyx, would need to be limited and I would need to do some specific testing and monitoring and even have her physical therapist do some special testing to determine that weight limit, but it would be limited.

. . .

Q.    OK.  What's her prognosis?

A.    I think her prognosis at this point is fair.  It's very difficult to project into the future and see exactly how she's going to respond over time.  There isn't a report or a textbook to look in that tells you the healing time for a condition such as Ms. Doornbos has, so the guidelines are very vague and fuzzy.  It would be a very long-term process for her.

. . .

Q.    . . . The restrictions that you imposed, as of January 19, 2007, what would be their duration?

A.    And again just to be clear, I haven't imposed any.  My speculated restrictions or the ones that I would recommend, should I be asked by the patient, I would maintain them as long as needed.  So if she is able to work two hours, then we will try 2-1/2 hours, and if she's able to do 2-1/2 hours, we will go for three, and hopefully over time, that would continue to improve, and she would be able to work without restrictions at some point in the near future, but again, it is a prediction that is difficult to make.

17

(PageID.661–667.)  The ALJ gave the opinions contained within the doctor's testimony only little weight.  The Court finds that the ALJ has provided good reasons, supported by substantial evidence, for doing so.

The ALJ began by correctly noting that statements that a claimant is disabled or unable to work are not medical opinions.  Accordingly, the doctor's initial statement is entitled to no particular deference. *See Buxton v. Halter*, 246 F.3d 762, 763 (6th Cir. 2001) (noting that while treating physicians' opinions may be entitled to great weight, the ALJ is not bound by conclusory statements regarding whether a person is legally disabled, especially if the ALJ's decision is well reasoned); *see also* 20 C.F.R. § 404.1527(d)(1)-(2) (noting that no special significance is given to medical opinions concluding a person is disabled, or opinions reserved to the Commissioner, such as the nature and severity of a person's impairments). The ALJ, however, must still "explain the consideration given to the treating source's opinion(s)." *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (quoting SSR 96–5p). The ALJ gave sufficient consideration here.

At bottom, as the ALJ recognized, the limitations provided by Dr. Lippert were speculative.  Namely, they were premised upon the occurrence of several future hypothetical events, including medication adjustments, further treatment by a physical therapist, osteopathic manipulation, and additional testing to ascertain her ability to lift.  Indeed, Dr. Lippert explicitly stated that she had not yet assigned Plaintiff any limitations.  As such, it was entirely reasonable for the ALJ to observe that these would not necessarily be the limitations that Dr. Lippert would assign outside of the deposition.  Further, the ALJ did not err in observing the vague nature of the limitations that were provided.  In fact, it cannot be determined whether the ALJ's RFC determination is inconsistent with much of the doctor's opinion.  The limitations contained in light

18

work and occasional stair climbing may very well account for Dr. Lippert's statements that Plaintiff is "limited" in lifting and climbing stairs.  Still, it appears the ALJ gave Dr. Lippert the benefit of the doubt and adopted those restrictions she found supported by the record.  Specifically she found several postural limitations, in addition to the need to change positions, supported by the record –such as Dr. Lazzara's consultative examination.   (PageID.1312.)  This was an entirely proper determination.  *See* 20 C.F.R. § 404.1527(c)(4) (noting "[g]enerally, the more consistent a medical opinion is with the record as a whole, the more weight [the Comissioner] will give to that medical opinion.").

In sum, because the opinions in question were speculative, vague, and articulated no specific functional limitations, or offered opinions on matters reserved to the Commissioner, the Court discerns no error in the ALJ's evaluation of this opinion.

B.      *Dr. John Lemke.*

On March 26, 2008, Dr. John Lemke completed a "Loan Discharge Application: Total and Permanent Disability" indicating that Plaintiff was unable to work as of July 21, 2005, due to coccydynia and a surgery that had been unsuccessful. (PageID.459.)  The ALJ assigned the opinion "little" weight noting, as she had with Dr. Lippert, that opinions regarding disability are reserved to the Commissioner.  (PageID.1312.)  For reasons stated above, the ALJ did not err in making this observation.  Moreover, to the extent Plaintiff attempts to prove disability because of the findings of another agency, she cannot succeed.   It is well established that a "decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not [the Commissioner's] decision about whether you are disabled or

19

blind." 20 C.F.R. § 404.1504.  Accordingly, the ALJ did not err in reducing the weight assigned to the March 26 opinion.

The record also contains an RFC questionnaire that was completed by Dr. Lemke on December 14, 2009.  (PageID.838–841.)  Among other things, Dr. Lemke indicated that Plaintiff was diagnosed with coccyx pain.  It was made worse with activity and relived by rest.  Plaintiff's pain ranged from 5/10 to 7/10 in intensity.  (PageID.838.)  When asked for the clinical findings that demonstrated the medical impairments, Dr. Lemke indicated that Plaintiff had pain to palpation over the coccyx and had been referred to multiple specialists.  (PageID.838.)  Dr. Lemke went on to indicate that this pain would constantly interfere the attention and concentration needed for Plaintiff to perform even simple work tasks.  (PageID.839.)  Plaintiff could not walk any distance without needing to rest or experiencing severe pain.  She could only sit for five or ten minutes before needing to shift position.  (PageID.839.)  Dr. Lemke also indicated that Plaintiff could only stand for fifteen to twenty minutes before needing to shift position.  In total, Plaintiff could only sit or stand/walk for less than two hours in an eight-hour workday.  (PageID.840.)  Plaintiff would also need to be able to shift positions at will, and take unscheduled breaks.  (PageID.840.)  Plaintiff could only rarely lift and carry ten pound weights, and never lift or carry heavier weights.  (PageID.840.)   In addition, Plaintiff could only rarely twist, and never stoop, crouch, and climb ladders or stairs.  (PageID.841.) Finally, Dr. Lemke stated that were she to work, Plaintiff could be expected to be absent from work more than four days per month.  (PageID.841.)  The ALJ assigned only "little" weight to the questionnaire.  (PageID.1312–1313.)  The ALJ has provided good reasons for doing so.

The ALJ first observed that Dr. Lemke was the supervising physician of Ms. Julie Brubaker, a nurse practitioner.  As such, the ALJ noted "Dr. Lemke himself has only evaluated the

20

claimant on a limited and intermittent basis, while Ms. Brubaker has provided the majority of the claimant's treatment at Dr. Lemke's office.  This suggests that Dr. Lemke would have had to formulate much of his opinion based on the treatment notes and findings of Ms. Brubaker." (PageID.1313.)  Plaintiff quibbles with the last portion of the ALJ's statement, stating that there is no evidence Dr. Lemke based his opinion off Ms. Brubaker's findings.  Perhaps, but the ALJ's determination here is eminently reasonable.  As Plaintiff herself admits, Dr. Lemke examined Plaintiff only five times in three years before authoring his opinion.  Agency regulations explicitly require ALJs to take into account the length, nature, and extent of a treating relationship.  20 C.F.R. § 404.1527(c)(2). The Court discerns no error here.

The ALJ went on to find the severity of the doctor's opinion to be inconsistent with the findings contained both in his treatment notes as well as in the examinations of other specialists. Substantial evidence supports this determination.  For example, several of Dr. Lemke and Ms. Brubaker's notes diagnose Plaintiff with coccydynia, but make no findings whatsoever regarding her musculoskeletal system.  Some notes do document Plaintiff's complaints of pain or find tenderness around the tailbone, but others also find a normal range of motion.  (PageID.734–735.)  At times, she also had a well coordinated gait and station.  (PageID.804.)

Specialist opinions also found Plaintiff to not be as limited as Dr. Lemke found.  On November 1, 2005, Plaintiff was examined by Dr. Randolph Russo.  (PageID.913–916.)  His clinical evaluation found tenderness on her lower spine and pelvic area, but there was nothing "of a significant degree on her assessment that provides any clues in regard to the pain generator." (PageID.915.)  A follow up bone study of the lumbar spine and pelvis found no abnormalities.

Dr. Russo subsequently indicated that Plaintiff could return to her normal activity levels. (PageID.912.)

Furthermore at an August 31, 2006, examination with Dr. James Wessinger, Plaintiff was found to be able to sit comfortably. The doctor noted she "did not fidget about as if she were in a lot of back pain." (PageID.907.) She also had a normal gait and was able to toe and heel walk. (PageID.907.) Dr. Wessinger further indicated that "[l]ateral bending, trunk rotation and extension are normal and flexion is excellent – she can touch her toes with her fingertips. She does not complain of any pain in her lumbosacral spine and there is no pelvic obliquity, scoliosis or other spinal deformity." (PageID.907.) Regarding her tail bone, the doctor found that it was tender to palpation over the lower sacrum and coccyx but there was no crepitus or deformity. (PageID.908.) Based on the absence of findings, Dr. Wessinger indicated he would not impose any restrictions. (PageID.908.)

Plaintiff's argument that these were not the specialists referenced by Dr. Lemke is meritless. Whether or not Plaintiff is correct, the fact remains that two specialists found Plaintiff's limitations fell well within the limits accommodated by the RFC. Citing *Gayheart*, Plaintiff argues that examining consultant opinions cannot provide substantial evidence to discount a treating physician's opinion. (PageID.2057.) Plaintiff is correct that an examining relationship is one of the factors an ALJ is to consider when weighing medical opinions. See 20 C.F.R. § 404.1527(c); *see also McClean v. Colvin*, No. 3:11–cv–236, 2013 WL 4507807, at *8 (M.D. Tenn. Aug. 23, 2013) ("[R]espective examining and non-examining status [is] only one of several relevant factors [.]"). Consistency is another important factor: "Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §§ 404.1527(c)(4),

416.927(c)(4). Here, the ALJ found that the specialist opinions were consistent with the record, while Dr. Lemke's opinion was not.  The Court finds no error here.

In sum, the ALJ provided good reasons, supported by substantial evidence, for assigning little weight to Dr. Lippert's and Dr. Lemke's opinions. Plaintiff's claim of error is denied.

### CONCLUSION

For the reasons set forth herein, the Commissioner's decision is supported by substantial evidence and therefore will be **AFFIRMED.**

A separate judgment shall issue.


Dated:       March 8, 2017            /s/ Robert J. Jonker
                                     ROBERT J. JONKER
                                     CHIEF UNITED STATES DISTRICT JUDGE